Filed 6/30/23  P. v. Calderon CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>TIMOTHY CALDERON,<br><br>  Defendant and Appellant. | F085581<br><br>(Merced Super. Ct. No. SUF19697)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Peña, Acting P. J., Meehan, J. and De Santos, J.

# INTRODUCTION

In 1995, appellant and defendant Timothy Calderon (appellant) was convicted after a jury trial of second degree murder. The trial court denied his motion to reduce his conviction to voluntary manslaughter and sentenced him to 15 years to life.

In 2022, appellant filed a petition for resentencing pursuant to Penal Code section 1172.6[1] and alleged he was convicted of murder based on imputed malice. The trial court appointed counsel, conducted a hearing, and found he was ineligible for resentencing as a matter of law.

On appeal, appellate counsel filed a brief which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record pursuant to both *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*) and *People v. Wende* (1979) 25 Cal.3d 436. Appellant submitted his own letter brief and requested this court address certain issues.

We will address appellant's contentions and affirm.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated. Appellant filed his petition in 2022 pursuant to former section 1170.95. As will be discussed below, the statute was substantively amended effective January 1, 2022, and renumbered as section 1172.6 without further change on June 30, 2022. (*People v. Saibu* (2022) 81 Cal.App.5th 709, 715, fn. 3.) As such, we refer to the subject statute by its current number throughout this opinion, except where otherwise indicated.

2.

## FACTS[2]

Appellant and Violet Guerrero began dating in June 1994 and continued their relationship until Violet's death.[3] On the afternoon of March 30, 1995, Violet and her best friend, Diana Diaz, were on their way to appellant's house when they saw a car containing Corina Cavasos and Linda Lopez. Violet and Cavasos, who worked with appellant at Pizza Villa, did not like each other. Cavasos had told appellant this and that she wanted to fight Violet. Diaz, who had known Violet for years, had never known Violet to be in a fight.

Cavasos and Lopez began following them, so Violet pulled over behind a police officer she knew. The other car kept going, and Violet and Diaz then drove straight to appellant's house. When Violet and Diaz arrived, appellant, his brother (Alex), and his friend (Robert Delgado) were there. The young women remained in Violet's car. Cavasos and Lopez then pulled up and got out of their car. Cavasos was uninvited, but

---

[2] When appellant filed his petition for resentencing in the superior court, the People filed opposition with a supporting exhibit consisting of a CD that contained the record from appellant's jury trial; that CD is part of the appellate record. In addition, the clerk's transcript in the instant appeal contains this court's nonpublished opinion that affirmed appellant's convictions on direct appeal. The following facts and procedural background are from the record and opinion in appellant's direct appeal, *People v. Calderon* (Mar. 9, 1998, F025281).

In reviewing a section 1172.6 petition, the court may rely on "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 292; *People v. Cooper* (2022) 77 Cal.App.5th 393, 406, fn. 9.) The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage. (*People v. Clements, supra,* 75 Cal.App.5th at p. 292; *People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*).) We have recited the factual statement from appellant's direct appeal to place his arguments in context and will not rely on that factual statement to resolve appellant's appeal from the trial court's order that found his petition did not state a prima facie case for relief.

[3] We refer to several persons by their first names for the sake of clarity. No disrespect is intended.

3.

she thought Violet would be there because appellant had previously told her that Violet usually stopped by after school.

Cavasos stepped up to Violet's window and told appellant to get her a bottle because she was going to break it on Violet's head. Robert Delgado then gave Lopez an empty beer bottle. Neither appellant nor Alex tried to stop Delgado. Cavasos held onto the bottle while she and Violet, who was still in her car, argued. Diaz told appellant to send Cavasos home, but appellant did nothing to get Cavasos away from Violet's car. At some point, Violet suggested they go out to the airport to fight, but Cavasos said no, let's do it here. Eventually, Cavasos threw down the bottle down, then opened the car door and pulled Violet out by the hair. Appellant did nothing to break up the fight.

The car started to roll back, so Diaz engaged the emergency brake and got out.[4] Violet and Cavasos were still wrestling on the ground. Appellant was standing in front of them. Diaz tried to break up the fight by pulling Cavasos off of Violet, but the men and Lopez pulled Diaz off. They told her to let them fight and get it over with. Diaz, who was still the only person trying to break up the fight, went back toward Cavasos again and pulled her by the hair to try to get her off of Violet. Lopez pulled Diaz's hair and the two of them started fighting. Their fight ended quickly, then finally Cavasos and Violet stopped. Afterward, the men made fun of Diaz.

When the fight ended, Violet had a cut on her elbow. Delgado saw appellant ask if she was all right. Appellant and the other men helped tend her wound. Violet was angry and scolding him because Cavasos was there. Violet and Diaz left and drove to McDonald's. Diaz needed ice for her cheek, and Violet's knee and elbow were scraped. Cavasos and Lopez stayed at appellant's house.

At McDonald's, Violet discovered that her pager was missing, so she telephoned appellant to see if it was at his house. He said it was not. In reality, Cavasos had found

_____

[4] According to Robert Delgado, appellant told him to hold the car. Delgado, appellant, and Alex Calderon braced the car so it would not roll back over Violet's head.

4.

the pager after the fight. Appellant told her to break it, but Cavasos decided to keep it instead.

Violet and Diaz subsequently returned to appellant's house. The men were still there, but Cavasos and Lopez had gone. Violet and Diaz returned because Cavasos had said she had given Violet a black eye. As the men had been teasing Violet about this, she wanted to prove Cavasos was wrong.

Diaz needed to use the telephone and restroom, so she returned to McDonald's in Violet's car. There, she arranged for a friend to pick her up, then she returned to appellant's house to give Violet back her car. When she arrived, appellant had his arms around Violet and was hugging her. Violet told Diaz she would telephone her when Diaz got home. Diaz and her friend then left. Diaz never saw Violet again.

Cavasos drove back by appellant's house about 30 minutes after leaving at the end of the fight. It was starting to get dark. Violet was sitting on the hood of her car. Appellant was standing by her. Cavasos did not see anyone else there.

Around 9:00 or 10:00 that evening, Robert Delgado, appellant, Alex, and Violet went to buy beer and then to McDonald's in Violet's car. Delgado was driving. Appellant and Violet were in the back seat. Appellant had his arm around Violet, but she was angry that Cavasos had been at appellant's house. At one point, appellant told her something like hold it down or to leave him alone. Delgado did not pay much attention. After Delgado picked up his work schedule at McDonald's, they returned to appellant's house, where Delgado started drinking. Violet did not get out of the car, and Delgado did not pay attention to what appellant was doing. After the beer was gone, appellant and Violet left. Delgado did not see her again.

Around midnight, Violet's mother telephoned Diaz and said that Violet had not yet been home. Mrs. Guerrero expected Violet to return at 8:00 p.m.; the young woman had never spent the whole night out. Diaz then telephoned appellant's house, but no one answered. This was around midnight.

5.

Around 1:00 a.m., Officer Xiong of the Merced Police Department was in the vicinity of 9th and N Street when he saw a vehicle turn southbound into the alley between 9th and 10th Streets and turn off its lights. Xiong turned into the alleyway and turned on his high beams, at which point the car's lights came on again and the car slowly drove eastbound through the alley toward N Street. As the car pulled into the driveway at 922 N Street (appellant's house), Xiong effected a traffic stop. The driver — appellant — exited and started walking toward Xiong.

Xiong told appellant the reason for the stop and asked what he was doing in the alley. Appellant said he was testing the headlights to make sure they were working. When asked to produce a driver's license, appellant said he had lost his. Xiong determined that appellant did not have a driver's license issued to him. Xiong also noticed a moderate odor of alcohol on appellant's breath and person. Xiong administered a field sobriety test; appellant was "borderline." Appellant was not impaired to the point where he would not be able to drive safely; however, he was in violation of the Vehicle Code because he was underage. Xiong issued him a ticket.

While Xiong was in contact with appellant, Officer King, who was acting as safety backup, asked appellant's passenger (a male) to get out of the car. King then looked inside the car for beer cans. He saw nothing unusual.

During the encounter, Xiong asked appellant for information regarding the registration of the vehicle. Appellant said it was his girlfriend's car. He said that he and she had gotten into a little disagreement, and that she had left with someone in a car. Xiong obtained the registration information from his dispatcher, then asked appellant if they could get in touch with the girlfriend to pick up the car. Appellant said he was not sure. When Xiong asked the name of the registered owner, appellant said it was the girlfriend's uncle. Xiong then decided to contact the uncle and release the car to him rather than impounding it. The dispatcher contacted the family to pick up the car. During the wait, appellant, Xiong, and King stood around, talking. During this time,

6.

Xiong briefly went to the passenger side and looked in through the front window. The back and rear side windows were tinted; Xiong "kind of stuck [his] head in" and looked around the front seat for open containers.

Around 2:00 a.m., the police telephoned Mrs. Guerrero and asked if Violet was there. When she said no, she was told to pick up the car at appellant's house. Mrs. Guerrero and her son went to appellant's house. When they arrived, the police were there with appellant. Violet was not there. Appellant said she had left with one of her cousins, "Jose," and that appellant did not know him.[5] Appellant gave a description of the car in which Violet had left. When appellant described the person and the car, Mrs. Guerrero did not know about whom he was talking, because Violet would never leave with anyone. When Mrs. Guerrero questioned appellant further, appellant said he did not know where Violet had gone. When Mrs. Guerrero asked why the car was still there, appellant said there was a fight in front of the house. He never said Violet had been in the fight. Appellant had Violet's car keys. Mrs. Guerrero told appellant to open the trunk of the car. Appellant did, but there was nothing inside. Mrs. Guerrero knew that something had happened to Violet, because Mrs. Guerrero had paged Violet at 8:00 p.m. and Violet had never answered the page. Violet would always communicate with her mother.

After the police left, Mrs. Guerrero questioned appellant about the last time he had seen Violet. Appellant said it was with that cousin, and that he did not know the person. When Mrs. Guerrero asked for Violet's car, appellant refused. He said that Violet had told him not to give the car to anyone and that she was going to come back in a little while. When Mrs. Guerrero told her son that they were going to take the car, appellant stood by the door and would not let her open it. Appellant's brother told Mrs. Guerrero's son to tell Mrs. Guerrero (who spoke only Spanish) that she had better not take the car.

---

[5] Mrs. Guerrero did have an 18-year-old cousin named Jose.

7.

Mrs. Guerrero and her son left and found one of the police officers who had been there earlier. Officers King and Xiong returned with them to appellant's house and let them take the car. When Mrs. Guerrero got the vehicle to her house, she found Violet's purse and book bag in front of the back seat. Violet never left her purse anywhere.

Around 9:00 that morning (March 31), Mrs. Guerrero and other family members went to appellant's work and talked to him. He said he still did not know anything, and he was very worried and was going to ask for time off from work to look for Violet. Appellant was very calm, as if nothing had happened. Between March 31 and April 2, Diaz and appellant had a number of telephone conversations in which they discussed Violet's disappearance.

On March 31, missing person reports were filed with the police in Atwater and Merced. Merced Police Officer Alcaraz talked to appellant, who said he did not know where Violet was. Appellant said they got into an argument in front of his residence, Violet got into a car with one of her cousins at 4:00 p.m. and left, and that was the last time appellant saw her. Appellant was calm during this conversation, and Alcaraz did not notice any injuries to appellant's hands or face.

Sometime that day, appellant told Delgado that Violet had taken off in a Cutlass. Delgado did not ask too many questions; he and Violet did not like each other. Delgado felt appellant was spending more time with her than with him. Appellant treated Violet differently than other women with whom he had had relationships; he was spending money on her because he felt she was worth it. Delgado and others made fun of appellant about the amount of time he was spending with Violet. This made appellant "kind of mad."

Late on the evening of April 1, Merced Detectives Varney and Byrd contacted appellant outside his house. Appellant did not appear shaken. Varney explained what they were investigating and asked if appellant would come down to the police department to talk to them. Appellant was cooperative. At the police station, Varney asked appellant

what he knew about Violet.  Appellant told about her fight with Cavasos and said that Violet was mad at him regarding some kind of party and his seeing some other girl. Appellant related that they had argued about this, then Violet telephoned her cousin Joe, who picked her up in a white vehicle that may have been a Cutlass.  Appellant related that Violet was going to come back, so he was to hold on to her car.  Appellant denied any knowledge of her disappearance.  During the interview, "he was very smooth." There was nothing to indicate there was anything wrong.  Appellant said he had made some telephone calls to Diaz, and that he would do anything to help in the investigation. He said that on the night Violet disappeared, he had tried to reach her by calling the pager.  At Byrd's request, appellant furnished the pager number.  When asked about being pulled over that night, appellant said he and his younger brother were going to a store in Violet's car.  On the way, he discovered he had no money, so he turned around and ended up in the alley.  For some reason, he was fiddling with the car headlights. Appellant indicated that he and Violet had a history of arguing, usually about her friends. As a result, they would not speak to each other for a couple of days.  He thought that on the night in question, she was just trying to make him jealous.  When Varney asked whether Violet had any other male friends, appellant suggested that she had been talking to one of her ex-boyfriends.  However, he did not say he was jealous because of this. Varney did not notice any injuries to appellant's hands, face, or neck which would indicate he had been in some kind of struggle.  At the end of the interview, Varney did not suspect appellant.

On April 2, Varney went to the Guerrero residence to look at Violet's car.  He did not see anything inside that indicated a struggle.

Around 8:30 that evening, Sheriff's Detective Clinton was dispatched to Highway 165 south of Highway 140 in rural Merced County, to assist in the investigation of a possible homicide.  When Clinton arrived, he found what appeared to be a body, wrapped in plastic, at the base of the bank of the San Joaquin River.  The body, which

9.

was down a slope from Highway 165, was partially in the water. It appeared to have been thrown over the guardrail of the bridge, then to have hit on the bank and rolled down the hill. The body was completely encased in a dark green garbage bag, duct tape was wrapped around the head, torso, and feet. The body was transported to the coroner's office.

The next day (April 3), the body was unwrapped in preparation for the autopsy. Inside the green plastic bag was an inner wrapping of a plastic feed bag-type material with duct tape wrapped around it. Identification in the pockets belonged to Violet Guerrero, and this identity was later confirmed.

Dr. Beaver conducted the autopsy. The external examination showed bruising on the neck, which indicated strangulation and that some effort was made by Violet to struggle with her attacker. In addition, Violet had minor scrapes and bruises on her knees and elbows. There was no other external evidence of lethal trauma.

Depending upon how much pressure is applied to the neck, strangulation can occur by cutting off the return of blood from the brain through the jugular veins to the heart, by cutting off the carotid artery's flow of oxygenated blood to the brain, or by compressing the airway. The least amount of pressure will affect the jugular veins. When this occurs, the blood backs up into the head. It takes 15 to 20 minutes of pressure to cause damage in this way. The pressure must be somewhat greater to cut off the carotid arteries because it must overcome the pressure of the blood from the heart. Once this pressure is applied, however, unconsciousness rapidly follows because the pressure shuts off the supply of oxygen through the blood to the brain. In this situation, unconsciousness will occur within 10 or 15 seconds.

During this 10 to 15 seconds, the victim — unless he or she is unconscious from another cause such as a drug overdose or is an infant — will be struggling. Dr. Beaver characterized this struggle as "a struggle for life or death." When the body loses consciousness, the person will go limp. There is a marked difference between struggling

10.

and the body going limp.  If the person is already lying down, he or she will not be able to maintain his or her face in a forward position without assistance.

If the hold is immediately released, the person will regain consciousness within a minute or two.  However, if pressure is maintained on the carotid artery beyond 10 or 15 seconds, brain damage will occur and the person will die.  In that situation, death "usually takes a couple of minutes, and the generally recognized time frame is no less than a minute.  And more likely upwards of two minutes."  During that time, the same amount of pressure — enough to stop the flow of blood to the brain — needs to be maintained.  The pressure required is around 11 pounds per square inch.[6]  In short, it would take 11 pounds of pressure per square inch applied for one to two minutes after the person has lost consciousness, to bring about death.  However, a lay person probably would not immediately be able to tell when death occurred.

The marker of manual strangulation is the hyoid bone, a horseshoe-shaped bone in the upper neck.  To fracture the bone, pressure must be placed on both sides of the bone so that it is held in place and then broken inward.  Violet's hyoid bone was fractured on both sides, and there was a lot of hemorrhage associated with the fracture.  The amount of pressure needed to break the hyoid bone varies from person to person and was not determined in this case.

With the exception of the injuries to the neck, Violet was perfectly healthy. Dr. Beaver could not say with medical certainty that the bruising on her neck had anything to do with the fatal injury.  However, Violet died because the blood flow to her brain was cut off.  This could have been accomplished without also cutting off her airflow, so that she would not have been gasping for breath.  Dr. Beaver believed the force was applied by two hands on the front of the neck, because the multiple collection of blood suggested multiple different points of pressure.  However, Violet could have

---

[6] The average human head weighs about 11 pounds.

died from someone squeezing the neck with one hand. Dr. Beaver believed there was one continuous hold; however, he could not exclude the possibility of a hold being released and reapplied.

Detectives Varney and Clair interviewed appellant around 2:30 or 3:30 p.m. on April 3.[7] During the course of this interview, Clair informed appellant that Violet's body had been found. Appellant repeatedly denied being involved in Violet's disappearance. His attitude started off being confident but progressed to being nasty and angry when the detectives became accusatory. When Clair showed him a photograph of Violet's wrapped body, appellant asked, "'Is that her?'" He grew quiet and somber but continued to deny involvement.

Once it became clear there would be no confession, Clair asked for and obtained appellant's consent to search appellant's residence. Appellant's parents also consented.

Clair asked Byrd to remain with appellant while Clair went to the Calderon residence. This took place around 5:40 p.m. Byrd sat with appellant for at least five minutes while appellant held his head in his hands and sobbed. Byrd then asked appellant what happened but received no response. Finally, just after 6:00 p.m., after Byrd asked a couple of times whether it was an accident, appellant said yes, it was an accident. Appellant said that he and Violet were playing around like they always did, that he did not mean to hurt her, and that he did not choke her that hard. Appellant said it happened in the parked car in an alley away from his house. When Byrd asked if he drank a lot that day, appellant said he only had two beers earlier. When Byrd asked what Violet said while appellant was choking her, appellant replied that she did not say anything. Appellant told Byrd: "'I wasn't drunk or nothing. The light was off. I tried to wake her up. [¶] I turned on the light and just tripped out. She wouldn't wake up. I got scared. [¶] Tell them this, I'm really scared. I would never do anything on purpose to

---

[7] Appellant was advised of, and waived, his constitutional rights.

12.

hurt her.'" Appellant also said he went home and woke his brother to go to the store. He said he wrapped Violet by himself, then " 'just drove.' "

Varney, Clinton, Clair, and other detectives searched appellant's residence. By the house, they found pieces of duct tape which resembled the ones found on the body.[8] Inside a shed, they found pieces of clear plastic like those found where the body was recovered. In addition, they found small pieces of pink insulation like those found within the wrappings. They also found plastic chicken feed bags. In addition, a small piece of vegetation had been found in Violet's shoelaces. Detectives found what they thought was similar vegetation at the house.

While Clair was at the residence, he was contacted by Byrd, who told him to return to the office. When Clair arrived, Byrd informed him that appellant wanted to talk to Clair and confess. Clair then conducted another interview of appellant, who was now very somber but no longer weeping. Appellant related that he and Violet were in her car. They were fooling around and wrestling, and he guessed he grabbed her by the throat too hard. He said he kept calling her and moving her, but she did not move. He then turned on the lights and saw she was dead. He went to the store and then tried to get rid of her because he did not want to get into trouble. Appellant said he went someplace out in the country to package her. He said he just started driving without paying attention to where he was going. It grew foggy; he saw a bridge and " 'tossed her out.' " Appellant denied wrapping the body in a feed bag or anything other than a garbage bag, and he insisted he acted alone.[9] Appellant also said he used Violet's car to take the body to the river.

Appellant described going to the 7-Eleven to purchase duct tape. He said that the body was in the back seat of the car at the time. Appellant said he had already disposed

---

[8] Shortly after midnight of March 30-31, appellant purchased duct tape from a 7-Eleven store on R Street. Appellant also asked if the store sold garbage bags, but the store was out of big bags. Appellant did not seem to be nervous or in a hurry.

[9] In fact, Alex Calderon had already admitted to police that he helped appellant dispose of the body.

of the body when he and his brother were stopped by Officer Xiong. Appellant denied ever placing the body in the trunk of the car. However, the speaker wires in the car were pulled out, and it appeared that the wires could only have come unhooked if something was pulled out of the trunk. In addition, hairs from Violet's head were subsequently found in the trunk of her car.

**Defense Evidence**

Violet's 15-year-old brother, Benjamin, testified that in March 1995, he, appellant, and Violet went to Disneyland, Universal Studios, and Tijuana. They returned the Monday before Violet died. At one point during the trip, appellant threw a television remote control at Violet.[10]

Appellant testified on his own behalf that he was 18 years old at the time of Violet's death, while she was 22. He and she first met on May 20, 1994, and began dating in late June of that year. Their relationship included sex. At times, they would sit in a car someplace and talk. Other times, they would have sex in a car. Violet's car (a white Honda) had front seats that reclined.

In March of 1995, appellant took Violet and Benjamin to southern California for several days for her birthday. They returned on the Monday before her death. They visited Universal Studios, Disneyland, and Tijuana. Appellant paid for the trip.

On March 30, 1995, appellant was working at Pizza Villa. Violet telephoned him that morning and they arranged to meet at appellant's house around 4:00 or 5:00 that afternoon. Appellant made no plans to have Cavasos come by. He was not seeing any other woman at the time and, to his knowledge, Violet was not seeing any other men. Appellant loved Violet.

---

[10] Benjamin admitted giving a statement to Detective Varney after Violet's death in which he said that nothing unusual happened between appellant and Violet during the trip.

14.

Violet and Cavasos showed up at his house around the same time that day. At some point, there was a fight between them. When they first argued, appellant did not think they were actually going to fight. He had never seen Violet fight anyone, knew she did not want to fight, and did not encourage the women to fight.[11] He never saw a beer bottle in Cavasos's hand, as he had his back turned while he talked to his brother. Had he seen that, he "[m]ost likely" would have intervened. Once the fight started, he never had a chance to stop the women. He was on the other side of the driveway, turned around and saw them fighting right beside the car, and saw the car rolling back. He told his brother, Alex, to grab the car, then they both tried to hold the car to keep it from rolling over the women. Appellant's mother came outside and yelled for him, so he quickly went to see what she wanted. He did not help Violet. The fight ended while he was talking to his mother. He did not see Violet's pager that night, nor did he suggest that anyone do something with it.

After the fight, Violet and Diaz left, and Cavasos and Lopez also left. A short time later, Violet telephoned appellant, then returned to his house. Diaz was with Violet. When Diaz again left, Violet stayed with appellant. Appellant noticed a cut on her elbow and had his brother get a bandage. Violet was still somewhat angry about the fight, but appellant did not believe she was angry at him. He kept asking her if she was all right.

After Diaz returned and then left again, Violet, appellant, Alex, and Delgado took Violet's car and went to buy beer and check Delgado's work hours. Delgado was driving. Appellant and Violet were in the back seat, holding hands and with appellant's arm around her. Violet asked appellant how Cavasos knew where he lived. She also asked whether he had been certain places and was seeing other girls. He told her no.

At McDonald's, appellant and Violet got out of the car. They saw a woman appellant knew. Violet told appellant that he had been going out with this woman.

_____

[11] Appellant denied being told by Cavasos that Cavasos wanted to fight Violet.

15.

Appellant confronted the other girl about it. After, they returned to appellant's house, where Violet sat in the car while appellant talked with his friends.

After a while, appellant got back into the car because he did not want to leave Violet alone. They then went someplace, like they usually did. That night, it was his idea to leave the house so they could go and talk somewhere. Appellant wanted to talk to Violet about the other girl saying he was with her. They parked in an alley by Club Mercedes, the alley being a spot they often used. Appellant did not want to talk at his house because he wanted to be alone with Violet. At the house, one of his friends would always drop by.

Once parked, appellant reclined the driver's seat, where he was sitting. He laid back, then Violet joined him in the driver's seat. They lay face to face, talking, with appellant's arm around her. It was dark in the car. They kissed.

Eventually, their talk turned to what had happened. Violet brought up that she had heard he had another girlfriend. She was upset and accused him of "messing around" with other girls. He kept telling her it was not true. They also discussed the fight, about which Violet was still upset. It bothered her that Cavasos had been at appellant's house. After this conversation started, they did not continue to be affectionate toward each other. At some point, appellant put his right hand on Violet's neck. Violet was sitting on the floor in the back of the car with her back resting against the back part of the car. She was shouting at him, calling him names and saying he had been messing around. When she called him "a fuckin' ho," it made him angry because what she was believing was not true. He was "kind of mad" and was trying to explain his side, but she was too busy yelling at him to let him explain. When she continued to yell at him, he testified, "I grabbed her, quiet her up, and try to explain my side." He grabbed her under the chin just to quiet her up. He did not intend to hurt her or kill her. He did not know that if he

16.

squeezed someone in the neck like that, it would cause injury or death. If he had known, he never would have done what he did.[12]

When appellant grabbed Violet, he told her to shut up and let him tell his side. He then began to tell her everything. She was quiet. He did not know whether he squeezed her tightly. He did not realize how tightly he was holding her. She made no sounds, nor did she struggle. He let go when he finished what he had to say. He did not know why he did not let go when she stopped yelling. He was looking at her face, but he could not tell if her eyes were closed. He could not tell if she went limp, as her head was already leaning somewhat as it rested against the back part of the seat.

When appellant was finished talking, he let go of Violet's neck, then sat up. The seat remained reclined. Violet was quiet, and appellant believed she was thinking about what he had said. Eventually, he became concerned because she was not moving. He called her, then, when she did not respond, he grabbed her arm and moved it. She was limp. He kept moving her and trying to wake her up. When he turned on the dome light in the car, he realized she was dead. He checked for a pulse and tried to hear her heart and see if she was breathing, but there was no life.

Appellant was scared and could not believe what had happened. It never crossed his mind to take her to a doctor because he figured that no one would believe what had taken place. There was no doubt in his mind that she was dead. He never thought that he might take her to a hospital and perhaps something could be done to revive her. His first thought at the time was for himself.

Appellant returned to his house on foot, then returned with Alex to Violet's car. Violet was in the back seat, and appellant and Alex got in the car. Appellant never

---

[12] On cross-examination, appellant admitted that he could have placed his hand over Violet's mouth to quiet her, but her throat was the first place he grabbed. He did not realize how hard he grabbed her, nor did he know he could kill her by doing that. He did not realize he was squeezing her. Appellant admitted that he was angry at Violet when he grabbed her, but he denied ever being angry enough to kill her.

placed Violet in the trunk. They headed for a 7-Eleven, as appellant knew he had to do something with the body. They ended up in an alley by the house because appellant had no money with him. At that point, they were contacted by Officer Xiong. Just before this, appellant had turned off the headlights so he would not be seen with Violet in the car. He lied to Xiong about why he was driving with the headlights off. He also lied about having a driver's license. He had heard of the new law that driving without a license would result in the car's being impounded. King and Xiong both missed seeing Violet's body in the back seat. King merely shined his light on Alex, who was in the passenger seat.

Violet's body was still in the car when her family came to appellant's house. Appellant could not bring himself to tell them what had happened. The family only looked in the trunk. After they left, appellant took the body to a shed that was under construction at the back of his house. There was insulation inside. He saw headlights, so he returned to the front of the house. Xiong and King and some of Violet's family were there.

After Violet's family left with the car, appellant went to the 7-Eleven and purchased some tape. Later, he went to Lucky's to buy some green plastic garbage bags. He wrapped Violet in whatever he could find. He was in a panic about getting in trouble. After the body was wrapped in the bags with the tape, he and Alex put it in the back of their father's pickup truck and drove out into the country. When it grew foggy and misty, they stopped. Appellant did not know there was a river there. They pushed the body over the guardrail, but never went down the bank to check on it. Then they left.

Appellant told the story about Violet leaving his house with a cousin because it was the first thing that came to mind when he was asked where she was. He continued to tell the story so he would not get in trouble. He initially lied to detectives and continued to deny any involvement in Violet's death because he knew they would not believe him. Even after he confessed, he lied about the body being wrapped out in the country because

18.

he did not want to involve his brother.  He also lied to the detectives about not being mad at Violet.  (*People v. Calderon*, *supra*, F025281.)

**PROCEDURAL BACKGROUND**

On June 28, 1995, an information was filed in the Superior Court of Merced County charging appellant with count 1, murder.

On November 7, 1995, appellant's trial began with motions and jury selection.

**The Jury Instructions**

The court instructed the jury with CALJIC No. 8.10, the definition of murder; and CALJIC No. 8.11, express and implied malice, that defined implied malice as a killing that resulted from an intentional act, "[t]he natural consequences of the act are dangerous to human life," and "[t]he act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."  The jury also received CALJIC No. 8.20 on premeditation.

The court gave CALJIC 8.30, defining second degree murder as a murder with malice but without premeditation.  CALJIC No. 8.31 further defined second degree murder as a killing that resulted from an intentional act, "[t]he natural consequences of the act are dangerous to human life," and "[t]he act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."[13]

---

[13] A finding of express malice requires evidence of an intent to kill, whereas a finding of implied malice requires only an "intent to do an act dangerous to human life with conscious disregard of its danger." (*People v. Breverman* (1998) 19 Cal.4th 142, 188; *People v. Landry* (2016) 2 Cal.5th 52, 96, fn. 11.)  CALJIC No. 8.31 defined the elements of implied malice, as incorporated into the elements of second degree murder. (*People v. Carr* (2023) 90 Cal.App.5th 136, 145, fn. 3.)

"Second degree implied malice murder … is not based on a theory of imputed malice." (*People v. Schell* (2022) 84 Cal.App.5th 437, 444.)  Implied malice and the natural and probable consequences theory are "distinctly different concepts." (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1056, review dismissed Nov. 17, 2021, S263939.)  "The 'natural consequences' language in the instruction for [implied malice] second degree murder does not transform [appellant's] conviction into one for murder under the

19.

The jury was instructed on voluntary and involuntary manslaughter as lesser included offenses of murder, and that the distinction between murder and manslaughter was that "murder requires malice while manslaughter does not."

The jury was not instructed on aiding and abetting, the felony-murder rule, the natural and probable consequences doctrine, or any theory of imputed malice.

**Conviction, Postverdict Motion, and Sentence**

On November 17, 1995, the jury convicted appellant of second degree murder.

On January 12, 1996, the court held a hearing on appellant's postverdict motion to reduce his murder conviction to manslaughter. Appellant argued there was insufficient evidence of malice, but there was evidence of provocation that required reduction of the conviction to voluntary manslaughter. The People replied there was no evidence of provocation, the manslaughter issue was argued to the jury, it rejected appellant's claims, and the jury's verdict of second degree murder was supported by substantial evidence. The court denied appellant's motion and found substantial evidence of malice, and insufficient evidence of provocation.

On the same day, the court sentenced appellant to 15 years to life.

**Direct Appeal**

On March 9, 1998, this court filed the nonpublished opinion in *People v. Calderon*, *supra*, F025281, and affirmed the judgment on direct appeal. We rejected appellant's challenges to the reasonable doubt instruction, his claim the trial court should have given an instruction on mistake of fact because appellant allegedly "did not know that if he held someone by the neck, the blood flow would stop and the person would die within one to two minutes," and his claim that the prosecutor's closing argument about appellant's state of mind was misleading.

---

natural and probable consequences doctrine within the meaning of section [1172.6]." (*Id.* at p. 1059.)

## SECTION 1172.6 PETITION FOR RESENTENCING

On June 28, 2022, appellant filed a petition, in pro. per., for resentencing of his murder conviction and requested appointment of counsel.

Appellant's supporting declaration consisted of a preprinted form where he checked boxes that stated (1) a complaint, information, or indictment was filed against him that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder the natural and probable consequences doctrine; (2) he was convicted of murder, attempted murder, or manslaughter following a trial, or accepted a plea offer in lieu of a trial at which he could have been convicted of murder or attempted murder; and (3) he could not presently be convicted of murder or attempted murder because of changes made to sections 188 and 189, effective January 1, 2019.

The court appointed counsel to represent appellant.

**The People's Opposition**

On August 4, 2022, the prosecution filed opposition, which recited the factual statement from this court's opinion in appellant's direct appeal, and argued appellant was ineligible for resentencing as a matter of law because he was convicted as the actual killer who acted with malice, and not based on any theories of imputed malice. As a supporting exhibit, the prosecution filed a CD that contained the record from appellant's jury trial.[14]

---

[14] The People's opposition also attached the reporter's transcript from appellant's hearing before the parole board in 2019, where appellant stated, under oath, that that he "got angry" and "strangled" the victim." In doing so, however, the People have cited to cases that held a petitioner's statements at a parole board hearing are admissible at a section 1172.6 evidentiary hearing, and not to make the prima facie determination. (See, e.g., *People v. Myles* (2021) 69 Cal.App.5th 688, 703; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 588.)

**The Court's Hearing**

On December 2, 2022, the court held a hearing on appellant's petition. Appellant appeared by videoconference and his attorney was present in the courtroom.

Appellant's counsel stated that he wished he could do something to help appellant on this matter, but appellant was doing well in prison and had been recommended for parole, but it was blocked by the governor. The prosecutor replied appellant was the actual killer and the jury was not instructed on any imputed malice instructions.

The court stated it had read and considered the moving papers and found appellant did not state a prima facie case because he did not qualify for resentencing under section 1172.6.

On January 12, 2023, appellant filed a timely notice of appeal.

## DISCUSSION

### I.    Delgadillo/Wende

In *Delgadillo*, the court held a *Wende* analysis is not applicable to a trial court's order that denies a petition for postconviction relief under section 1172.6. (*Delgadillo, supra*, 14 Cal.5th at p. 222.) *Delgadillo* held that instead of using the process outlined in *Wende*, appointed counsel and the appellate court should do the following: "When appointed counsel finds no arguable issues to be pursued on appeal: (1) counsel should file a brief informing the court of that determination, including a concise recitation of the facts bearing on the denial of the petition; and (2) the court should send, with a copy of counsel's brief, notice to the defendant, informing the defendant of the right to file a supplemental letter or brief and that if no letter or brief is filed within 30 days, the court may dismiss the matter." (*Id*. at pp. 231–232.)

"If the defendant subsequently files a supplemental brief or letter, the Court of Appeal is required to evaluate the specific arguments presented in that brief and to issue a written opinion…." (*Delgadillo, supra*, 14 Cal.5th at p. 232.)

As noted above, appellate counsel filed a brief with this court pursuant to *Delgadillo* and *Wende*. The brief also included counsel's declaration that appellant was advised he could file his own brief with this court. This court sent appellant an order that, pursuant to *Delgadillo*, the appeal would be dismissed as abandoned if he failed to submit a letter brief within 30 days. On May 26, 2023, appellant filed a supplemental brief with this court in response to our *Delgadillo* order. We thus turn to his arguments.

## II. The Court's Order Denying the Petition

We first note that the court complied with section 1172.6 by appointing counsel, conducting a hearing on the petition, and giving reasons for finding appellant's petition did not state a prima facie case and he was ineligible as a matter of law. (§ 1172.6, subds. (b), (c).)

The prima facie inquiry under section 1172.6, subdivision (c) is "limited." (*Lewis, supra*, 11 Cal.5th at p. 971.) The court " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citation.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid.*)

The court may review the record of conviction that allows it "to distinguish petitions with potential merit from those that are clearly meritless. This is consistent with the statute's overall purpose: to ensure that … culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of a single-step prima facie review process." (*Lewis, supra,* 11 Cal.5th at pp. 971–972 & fn. 6.)

The jury instructions are part of the record of conviction and may be reviewed to make the prima facie determination. (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251–1252; *People v. Offley* (2020) 48 Cal.App.5th 588, 599; *People v. Harden* (2022) 81 Cal.App.5th 45, 59–60.)

Appellant was the only person charged in the information with murder. The jury was instructed on first degree premeditated murder, express and implied malice, second degree murder based on implied malice, and voluntary and involuntary manslaughter as lesser offenses. The jury was not instructed on aiders and abettors, the felony murder rule, the natural and probable consequences doctrine, target and nontarget offenses, or any theories of imputed malice.

The record of conviction thus establishes that appellant was convicted as the actual killer who acted with malice, his conviction was not based on any theory of imputed malice, and the court correctly denied his petition without issuing an order to show cause and found he failed to state a prima facie case for resentencing because he was ineligible as a matter of law.

### III.    Appellant's Contentions

In his supplemental brief, appellant states he is not seeking relief for the "homicide," but his second degree murder conviction should be reduced to manslaughter. Appellant further states the People's argument that he was the actual killer "does not apply here," and there was evidence of "imputed malice based on a sudden quarrel crime qualifys [*sic*] for relief" to result in a manslaughter conviction, and the trial court committed error by not following the amendments enacted by Senate Bill Nos. 1437 (2017–2018 Reg. Sess.) and 775 (2020–2021 Reg. Sess.). Appellant also claims the trial court failed to state reasons for denying his petition.

As set forth above, the record of conviction establishes that the jury herein was not instructed on aiding and abetting, the natural and probable consequences doctrine, or any theories of imputed malice, and the trial court clearly agreed with the People's opposition

24.

that raised this argument when it denied appellant's petition.  The jury instructions establish appellant was convicted of second degree murder based on implied malice. While the amendments enacted by Senate Bill Nos. 1437 and 775 prohibit reliance on imputed malice theories, the amendments maintained the viability of murder convictions based on implied malice and the definition of implied malice remains unchanged. (*People v. Clements, supra*, 75 Cal.App.5th at p. 298; *People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)  As explained above, "[s]econd degree implied malice murder … is not based on a theory of imputed malice."  (*People v. Schell*, *supra*, 84 Cal.App.5th at p. 444.)

Also in his supplemental brief, appellant asserts the trial court erroneously denied his post-verdict motion filed in 1996, to reduce his second degree murder conviction to voluntary manslaughter.  Section 1172.6 "does not permit a petitioner to establish eligibility on the basis of alleged trial error."  (*People v. DeHuff* (2021) 63 Cal.App.5th 428, 438, fn. omitted.)  "The purpose of [section 1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' " (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.)

## DISPOSITION

The court's order of December 2, 2022, denying appellant's petition for resentencing, is affirmed.

25.